

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

---

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney*<br><br>*A. David Copperthite*<br>*Assistant United States Attorney* | *36 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | *DIRECT: 410-209-4805*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091*<br>*TTY/TDD: 410-962-4462*<br>*David.Copperthite@usdoj.gov* |

February 7, 2013

Steven H. Levin, Esquire
Levin & Curlett, LLC
250 W. Pratt Street
Suite 1300
Baltimore, Maryland 21201

Re:    <u>United States v. Rico Bias</u>
        Crim. No. ELH-12-528

Dear Mr. Levin:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **February 21, 2013**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(1)(C) to Counts One and Four of the Indictment now pending against him, which charge him with Conspiracy to Interfere with Commerce by Robbery (Hobbs Act Robbery), in violation of 18 U.S.C. § 1951(a) and Possessing or Brandishing a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c). The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Revised  11/5/09

Count One:

That from on or about January 22, 2012 through June 11, 2012, in the District of Maryland,

<blockquote>

a. The Defendant conspired with at least one other person to obtain property from another without that person's consent; and

b. The Defendant did so by wrongful use of actual or threatened force, violence, or fear; and

c. As a result of the Defendant's actions, interstate commerce, or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in some way or degree.

</blockquote>

Count Four:

That from on or about June 11, 2012, in the District of Maryland,

<blockquote>

a. The Defendant committed a crime of violence, interference with commerce by robbery, as charged in Count Two of the Indictment, for which he might be prosecuted in a court of the United States; and

b. The Defendant knowingly brandished a firearm in furtherance of the commission of the crimes charged in Count Two of the Indictment.

</blockquote>

Penalties

3. The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows: As to Count One, twenty years imprisonment, a $250,000 fine, and a maximum term of supervised release of three years; and as to Count Four, life imprisonment, a seven (7) year mandatory minimum sentence consecutive to any other sentence; a period of supervised release of five (5) years, and a $250,000 fine.

In addition, the Defendant must pay $100 as a special assessment as to each count of conviction, pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§

3663, 3663A, and 3664.[1]  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.  The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.  The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

### Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt.  The Defendant would have the right to confront and cross-examine the government's witnesses.  The government would not have to present any defense witnesses or evidence whatsoever.  If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify.  If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

---

[1]      Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him.  By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence.  By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case.  Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he/she is not a citizen of the United States, pleading guilty may have consequences with respect to his/her immigration status.  Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States.  Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his/her attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he/she wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the following Statement of Facts set forth in "Attachment A", which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.      It is the government's position that Defendant is a Career
Offender pursuant to U.S.S.G. §4B1.1(a) because Defendant has previously been
convicted of at least two crimes of violence. Pursuant to U.S.S.G. §§ 4B1.1(b) and
4B1.1(c)(2)(A), the parties agree that if Defendant is a career offender the base
offense level applicable to Count One is therefore **Level 32**, with a criminal
history category of **VI**. The parties further agree that Count Four carries a
minimum mandatory sentence of **84 months consecutive to Count One**. This
agreement does not affect the Court's discretion to impose any lawful term of
supervised release or fine or to set any lawful conditions of probation or
supervised release. The Defendant reserves the right to challenge the finding of
Career Offender as set forth in ¶¶ 7 and 11 below.

b.      This Office does not oppose a two-level reduction in the
Defendant's adjusted offense level, based upon the Defendant's apparent prompt
recognition and affirmative acceptance of personal responsibility for his criminal
conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for
an additional one-level decrease in recognition of the Defendant's timely
notification of his intention to plead guilty, resulting in a **final offense level of 29
if Defendant is found to be a Career Offender, as to Count One,  plus a
consecutive minimum mandatory sentence of 84 months incarceration in the
Bureau of Prisons, as to Count Four.**  This Office may oppose *any* adjustment
for acceptance of responsibility if the Defendant (a) fails to admit each and every
item in the factual stipulation; (b) denies involvement in the offense; (c) gives
conflicting statements about his involvement in the offense; (d) is untruthful with
the Court, this Office, or the United States Probation Office; (e) obstructs or
attempts to obstruct justice prior to sentencing; (f) engages in any criminal
conduct between the date of this agreement and the date of sentencing; or (g)
attempts to withdraw his plea of guilty.

7.      It is the government's position that the Defendant is a Career Offender,
pursuant to U.S.S.G. §4B1.1 with a criminal history category of VI. The Defendant reserves the
right to challenge the Career Offender status.

8.      This Office and the Defendant agree that with respect the calculation of
the advisory guidelines range, no other offense characteristics, sentencing guidelines factors,
potential departures or adjustments set forth in the United States Sentencing Guidelines will be
raised or are in dispute.

## Obligations of the United States Attorney's Office

9.      At the time of sentencing, this Office will recommend a sentence within
the applicable advisory guideline range as calculated by the Court.  At the time of sentencing,

this Office will move to dismiss any open counts against the Defendant.

10.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

### Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.     The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it **exceeds the applicable advisory guideline range for offense level 29, plus seven (7) years incarceration in the Bureau of Prisons**; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is **below the applicable advisory guideline range for offense level 29, plus seven (7) years incarceration in the Bureau of Prisons,** and (iii) **Defendant reserves the right to appeal any finding that he is a Career Offender as defined in U.S.S.G. §4B1.1.**

c.     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Restitution

12.     The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§

3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Obstruction or Other Violations of Law

13.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

14.     The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for

that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

15.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
A. David Copperthite
Assistant United States Attorney

     I have read this agreement, including the Sealed Supplement,  and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney.


28 Feb. 2013                                         _____
Date                                                          Rico Bias


     I am Rico Bias' attorney.  I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him.  He advises me that he understands and accepts its terms.  To my knowledge, his decision to enter into this agreement is an informed and voluntary one.


25 Feb  2013                                          _____
Date                                                          Steven H. Levin, Esq.

## ATTACHMENT A:   Statement of Facts – Rico Bias

*The United States and defendant Rico Bias, stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt.   They further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

Beginning on or about January 22, 2012 through June 11, 2012, Hatratico Smith, along with Defendant Rico Bias, Monzell Lee and others, agreed and conspired to interfere with commerce by robbery, of various businesses engaged in interstate commerce, and identified below, through the use of a firearm, specifically a silver in color Smith & Wesson revolver, serial number AYD1547. During the robberies, the firearm was brandished as described below, and on two occasions, discharged, with one resulting in the shooting of a customer on February 21, 2012 at a Royal Farm Store. Defendant agrees that in each of the robberies described below property was attempted to be taken or was taken from the victims by force or threat of force and each of the robberies delayed, obstructed, affected and interfered with commerce.

### *HATRATICO SMITH and RICO BIAS*

#### *January 22, 2012 Royal Farms Store*
#### *2700 Taylor Avenue, Baltimore, Maryland*

On January 22, 2012, the Royal Farms store located at 2700 Taylor Avenue, Baltimore Maryland was robbed at approximately 10:54 pm. Smith, wearing a black jacket, black hood, and approached the clerk and asked for a pack of Newport cigarettes. Smith brandished the silver revolver and demanded money, stating, "Open the register or I'll blow your brains out." Smith received about $96.00 in U.S. currency and fled the store.

#### *January 24, 2012, Woodlea Bakery*
#### *4905 Belair Road, Baltimore, Maryland*

On January 24, 2012, Smith robbed the Woodlea Bakery located at 4905 Belair Road.

1

Smith was wearing a black and white plaid shirt, blue jeans and brandished a silver revolver. Smith asked the cashier a couple of questions then brandished the revolver and demanded money. The employee ran to the back of the store and then Smith fled. During the course of the robbery, surveillance showed Smith was not wearing gloves and touched several surfaces including near the exit door. A latent print was recovered from the surface by the exit door which was compared by a certified print examiner and identified as the print of Smith.

### *January 26, 2012, Pepe's Pizza*
### *6081 Falls Road, Baltimore, Maryland*

On January 26, 2012, Smith entered Pepe's Pizza, wearing a hooded sweatshirt, square reading type glass and a black mask. Smith approached one of the employees, grabbed him by the collar and pulled him to the register. Smith told the employee to "Open the fucking registers and empty both of them." Smith brandished a silver revolver. Smith obtained approximately $3,000.00 in cash and fled on foot.

### *January 28, 2012, Royal Farms Store*
### *2330 Smith Avenue, Baltimore, Maryland*

Smith entered the Royal Farms Store at approximately 8:49 p.m., wearing a black jacket, baseball cap with a hooded sweatshirt and sunglasses brandishing a silver revolver. Smith robbed one clerk of $170.00 U.S. currency and attempted to rob the clerk in the deli section but she was unable to access the register there. Smith fled out the front door.

### *February 1, 2012, Royal Farm Store*
### *206 W. Cold Spring Lane, Baltimore, Maryland*

Smith entered the Royal Farms Store wearing a black jacket, mask, and a baseball cap brandishing a silver revolver. Smith initially asked for a pack of Newport cigarettes then brandished the silver revolver. Smith told the clerk to give him all the money and he took $41.00 in

cash and Newport cigarettes and fled the store.

### *February 2, 2012, Shopper's Food Store*
### *803 Goucher Boulevard, Baltimore, Maryland*

Smith entered the Shopper's Food Store at about 9:45 p.m., wearing a hooded sweatshirt and a red devil mask and black gloves. Smith went up to the register and told the cashier to "Kick that shit out,". Smith demanded the register be opened and threatened to shoot the cashier. After the cashier was unable to open the register, Smith left the store and tried to grab the purse from a female customer who was entering the store. A struggle ensued and Smith grabbed a necklace off the female customer and fled with the necklace. Smith brandished a silver revolver during the course of the events at Shopper's Food Store.

### *February 2, 2012, Royal Farms Store*
### *8207 Harford Road, Baltimore, Maryland*

At 10:18 p.m., Smith entered the Royal Farm Store wearing a dark jacket, hooded sweatshirt, red devil mask and purple Ravens gloves. Smith approached two employees and walked them to the register, stating, "Go, bitch, give me all the money in the drawer.  Open them now. Give me everything, coins and all." Smith also demanded Newport cigarettes. Smith brandished a silver handgun during the robbery. Smith obtained about $345.00 in U.S. currency and about 20 packs of Newport cigarettes.

### *February 12, 2012, Shopper's Food Store*
### *803 Goucher Boulevard, Baltimore, Maryland*

On February 12, 2012, Smith entered the Shopper's Food Store, dressed in similar clothes as the prior robbery but this time wearing a black and white skeleton mask. Smith pointed a silver revolver at the cashier and stated, "Open the register, open it now." The victim put $598.00 U.S. currency in a bag, which Smith took and fled the store.

3

*February 14, 2012 Pizza Boli's*
*610 Reisterstown Road, Baltimore, Maryland*

Smith entered the Pizza Boli's at about 11:43 p.m., wearing a black hoody and a checkered scarf over his face, black gloves, brandishing a silver handgun. He pointed the silver revolver at one of the victim cashiers and demanded the register be opened. Smith took about $400.00 in currency. A witness who was outside the store saw Smith getting into a red Zip Car rental car. About five minutes prior to the robbery, co-defendant Rico Bias entered the store and asked what time they closed. Rico Bias had entered to see whether any customers were in the store. Rico Bias had rented the red Zip car and drove the car during the robbery.

*February 21, 2012, Burger King*
*6605 Reisterstown Road, Baltimore, Maryland*

On February 21, 2012, at about 8:25 p.m., Smith wearing a black jacket with an orange logo "MF" on the front, a black ski mask, jeans and gloves approached the counter, pointed a silver revolver at the cashier and stated, "Give me everything that you got." The cashier and other employees fled to the back of the store. Smith then approached two customers who were having dinner and demanded the wallet from the male customer. The male customer complied but there was no cash in the wallet. Smith asked the female customer for her purse, but she did not have one. Smith fled and was seen getting into a vehicle and leaving the scene. Prior to Smith entering the Burger King, Defendant entered and checked to ensure the robbery could occur. Bias purchased two chicken sandwiches while he checked for Smith to commit the robbery.

*February 21, 2012, Royal Farms Store*
*5232 Harford Road, Baltimore, Maryland*

At about 9:36 p.m., Smith along with Rico Bias entered the Royal Farms Store. Smith was wearing the same Black jacket with the orange "MF" logo, and hooded sweatshirt. Smith initially

waited for the cashier in the front of the store. When the cashier came back to the register from the rear area of the store, Smith accosted her and brandished a silver revolver and demanded she give him money from the register. Smith went behind the counter and grabbed an unknown amount of money from the register and Newport cigarettes. Smith came out from behind the counter and approached a male customer who was unaware the robbery was taking place. Smith accosted the male customer and demanded his wallet. The customer was on the phone with earbuds on and had to take them out to hear. He was handing Smith the wallet when Smith shot him in the abdomen. Smith fled the store. Bias, who was standing near the magazines, left the store prior to the robbery. The victim was taken to the hospital where he was treated for a gunshot wound to the abdomen. The victim survived the shooting. Bias drove the getaway car after the shooting and robbery occurred.

### February 22, 2012, Royal Farms Store
### 6067 Falls Road, Baltimore, Maryland

On February 22, 2012 at about 11:12 p.m., Smith entered the Royal Farms Store wearing the black jacket with the orange, "MF" logo. Smith was wearing a face mask covering most of his face. Smith brandished a silver revolver and demanded money from the clerk. Smith went behind the counter and took $91.00 U.S. currency and Newport cigarettes. Smith put the money and cigarettes in a bag and fled the store. Smith was seen getting into a Ford Windstar van, possibly green in color, leaving the scene at a high rate of speed. Bias drove the vehicle from the scene.

### March 6, 2012, Royal Farms Store
### 1119 W. 41st Street, Baltimore, Maryland

On March 6, 2012, at about 3:52 a.m., Smith entered the Royal Farms store, wearing a black jacket, hooded sweatshirt, black gloves brandishing a silver revolver. Smith demanded money from the clerk and went behind the counter, taking money from the register and Newport

5

cigarettes. During the course of the robbery, Smith discharged a round from the handgun, which struck a magazine rack in the store. Smith fled the store.

### May 15, 2012, Royal Farms Store
### 8207 Harford Road, Baltimore, Maryland

On May 15, 2012 at about 11:41 p.m., Smith wearing the black jacket with the orange "MF" logo, white baseball cap, hooded sweatshirt and black rimmed glasses entered the Royal Farms store. Smith brandished a silver revolver, went behind the counter with the employees and demanded money from two drawers and Newport cigarettes. Smith called the women "bitches" and threatened to shoot them if they did not hurry up. Everything was placed in a bag and Smith fled the store. Bias drove Smith from the scene.

### May 16, 2012, Royal Farms Store
### 920 W. 36th Street, Baltimore, Maryland

On May 16, 2012, at about 1:04 a.m., (less than two hours after the prior robbery), Smith, wearing a black jacket or hoody with a zipper, entered the Royal Farms Store displaying a silver revolver. Smith went behind the counter with the clerk and said, "Open the register." Smith then took $53.00 U.S. currency and Newport cigarettes and demanded the cashier's wallet as well. Smith then fled the store. Surveillance showed a light colored mini-van in the area at the time of the robbery. Bias drove Smith from the scene.

### May 19, 2012, Royal Farms Store
### 6067 Falls Road, Baltimore, Maryland

On May 19, 2012 at about 1:25 a.m., Smith, wearing the same black jacket with the orange "MF" logo, a New York Yankees hat and a ski mask, entered the Royal Farms Store. Smith approached the counter and brandished a silver revolver. Smith went behind the counter and told the clerk to "Hurry up and get the money." Smith took currency and put it in his pockets. Smith

ordered the clerk to put Newport cigarettes in a bag for him. Smith then fled the scene. Bias drove Smith from the scene.

### *May 20, 2012, Royal Farms Store*
### *7950 Pulaski Highway, Baltimore, Maryland*

On May 20, 2102 at about 2:04 a.m., Smith entered the Royal Farms Store wearing the black jacket with the orange "MF" logo, a New York Yankees baseball cap, sunglasses and a ski mask. Smith brandished a silver revolver and told the clerk to be quiet and give him the money in the register. Smith told the clerk, "Hurry the fuck up bitch," and threatened to shoot her. He went behind the counter and demanded money and Newport cigarettes and demanded that the clerk hurry up. When the clerk did not appear to be putting the cigarettes in the bag fast enough, Smith grabbed Newport cigarettes and put them in the bag. As he was leaving, another employee started to confront Smith, not aware Smith was armed. Smith lunged at the employee before leaving. Bias drove Smith from the scene.

### *May 20, 2012, Royal Farms Store*
### *119 W. 41st Street, Baltimore, Maryland*

On May 20, 2012 at about 3:22 a.m., Smith dressed in the same clothing as the 2:04 a.m. robbery, entered the Royal Farms Store. An employee was mopping the floor when Smith entered. Smith approached the employee and pointed a silver revolver at the employee. Smith ordered the employee behind the counter and demanded she open the register. Smith grabbed currency and a roll of quarters from the registers and fled the store.

### *HATRATICO SMITH, RICO BIAS and MONZELL LEE*

### *May 28, 2012 Burger King*
### *8311 Harford Road, Baltimore, Maryland*

On May 28, 2012, at about 10:30 p.m., Smith wearing a white baseball cap, glasses and a

plaid button down shirt, entered the Burger King. Smith brandished a silver revolver. Smith was accompanied by Monzell Lee, who was wearing a light blue T-shirt, a "Kings" ball cap, a white bandana covering his face and purple Ravens gloves. When Smith and Lee entered, a customer was paying for his food. Smith pointed a silver revolver at the cashier and demanded the register be left open. Smith reached in and grabbed currency from the cash register drawer. He and Lee fled the store. A light blue minivan was seen fleeing the area. Bias drove Smith and Lee from the scene.

### May 29, 2012, Royal Farms Store
### 1915 Belair Road, Harford County, Maryland

Smith and Monzell Lee entered the Royal Farms Store at about 12:11 a.m., dressed in the same clothes as the Burger King robbery an hour and a half before. Smith brandished a silver revolver. Both went behind the counter and Smith ordered the clerk to open the registers, stating, "Start opening up the registers". Lee began putting Newport cigarettes into a bag. After emptying two registers they demanded a third be opened and threatened to shoot a clerk if they did not hurry up. The clerk was unable to open the register and Smith and Lee fled with currency and the Newport cigarettes. Bias drove Smith and Lee from the scene.

### May 29, 2012, Royal Farms Store
### 920 W. 36th Street, Baltimore, Maryland

On May 29, 2012, at about 1:35 a.m., Smith and Monzell Lee, dressed in the same manner, entered the Royal Farms Store. Smith and Lee forced the employees behind the registers. Smith brandished the silver revolver and took money from the register drawers while Lee filled two brown bags with Newport cigarettes. Smith and Lee fled the store. A light colored mini-van was seen leaving the area. Bias drove Smith and Lee from the scene.

8

*June 11, 2012, Wendy's Restaurant*
*3620 Washington Boulevard, Elkridge, Maryland*

On June 11, 2012, at about 9:40 p.m., Smith wearing a burgundy plaid shirt, white ball cap, big glasses and a ski mask, along with Monzell Lee wearing a t-shirt and shorts entered the Wendy's restaurant and Smith brandished a silver revolver and demanded money. Bias remained in the Windstar mini-van and acted as the getaway driver for this robbery. Smith pointed the revolver at the clerk and Lee jumped over the counter and took currency from the drive-through window register. Smith and Lee left the store and were seen fleeing in a light colored Ford Windstar mini-van, driven by Bias.

Prior to this robbery, investigators had identified Smith from the fingerprint at the Woodlea Bakery and had tracked Smith down to a residence at 4229 Seidel Avenue, Baltimore, Maryland, which was actually the residence also of Rico Bias. Investigators had obtained authorization from the United States District Court to place a GPS tracking device on two Ford Windstar mini-vans which agents had probable cause to believe were being used in the serial robberies. Those mini-vans were owned by Howard Persaud, but used and driven by Rico Bias and possibly Smith. Agents also obtained a video from a Walmart store right near the Royal Farms store that was robbed on May 29, 2012. On the video, agents were able to identify Smith, Rico Bias and Monzell Lee. They walked into the Walmart and purchased three black and white bandanas. They were wearing the same clothing they wore when committing the robberies at the Burger King that happened an hour and a half before and the Royal Farms store robbery that occurred after the Walmart purchases were made and Defendants were captured on video. With that information, agents began surveillance on the residence at 4229 Seidel Avenue and the two mini-vans. Lee was staying with his girlfriend at 4235 Seidel Avenue at the time.

9

On June 11, 2012 following the robbery of the Wendy's in Baltimore County, the agents were notified and followed the Windstar mini-van by utilizing the GPS tracking device, which had been covertly placed on the vehicle. When an officer attempted to pull the van over by activating his emergency lights, the driver, Bias, attempted to flee in the area of Washington Boulevard and Schroeder Streets. All three occupants ran from the van but were located and taken into custody.

Smith was wearing the burgundy plaid shirt and carrying a backpack which he discarded when he ran. It was recovered and contained a red devil like Halloween mask, which had been used in the first Shopper's robbery. Also in the back pack was the silver Smith & Wesson revolver used in the robberies and some gloves. Inside the van, purple Ravens gloves were recovered, along with several hats including a New York Yankees hat, a white ball cap with a Ravens logo and medical type gloves. They also recovered two black leather jackets. After a search warrant was obtained and conducted at 4229 Seidel Avenue, agents recovered the black jacket with the orange "MF" logo (Mountain Fog) used by Smith in many of the robberies.

Subsequent to his arrest, Smith was properly advised of his rights pursuant to *Miranda v. Arizona,* and Smith waived those rights and provided a video recorded statement. Smith admitted to committing the Wendy's robbery that night. When confronted about the other robberies, Smith stated, "What you have right there is going to put me away for life,". Smith admitted to robbing several Royal Farms stores, some of them twice. Smith admitted to the robbery of the Royal Farms Store where he discharged the firearm into the magazine rack. Smith stated it was an accident and after that he removed the bullets from the revolver because he said the gun went off very easily. He admitted to robbing a pizza place. At some points in the interview, he stated, "I did all of them but...". When asked about the shooting of the customer on February 21, 2012 at the Royal Farms Store, Smith said he didn't remember shooting anybody.

10

Prior to his arrest, on April 12, 2012, Smith received a traffic citation for driving without a license when he was operating a grey Mazda Zip Car rental car. The Zip Car was being rented at the time by Bias. A check of records obtained by the agents indicated that a Zip Car rented by Bias matched the red Zip Car used in the robbery of the Pizza Boli's. Smith admitted that he brandished the silver revolver during all of the robberies.

Rico Bias provided a statement after knowingly waiving his rights pursuant to *Miranda*, and admitted that he drove the mini-van or Zip Cars during most of the robberies. Bias also stated that he often went inside the businesses to check them out before the robberies. Bias admitted to going inside the Royal Farms Store on February 21, 2012 to check the store out before the robbery. Bias stated he left the store before the robbery and shooting occurred. Bias stated that Smith told him that Smith shot somebody. Bias drove Smith from the scene of the shooting.

The parties agree that the firearm, the Smith and Wesson revolver, described above and in the indictment, meets the definition of a firearm as described in 18 U.S.C. §921(a)(3), in that it was designed to expel a projectile by means of an explosion. The parties agree that the firearm was brandished during each of the robberies, and discharged on February 21, 2012 during the robbery of the Royal Farms Store when the customer was shot, and also discharged on March 6, 2012 during the robbery of the Royal Farms Store. The parties also agree that they interfered with commerce by robbery since the robberies obstructed, delayed, and affected commerce. The Defendant agrees that he conspired with Smith and Lee to commit the act charged in Count One and did in fact aid and abet in the brandishing of the firearm as described in Count Four.

11

25 Feb 2013