IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICO BIAS<br>  Defendant. | Criminal No.: ELH-12-0528 |

**MEMORANDUM OPINION**

Rico Bias, the self-represented defendant, filed correspondence requesting a sentence reduction, construed as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). ECF 257 (the "Motion"). The Office of the Federal Public Defender advised the Court that it would not be supplementing the Motion. ECF 260. The government has not responded.

No hearing is needed to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I.     Background[1]**

On October 4, 2012, defendant and two others were indicted on multiple charges relating to twenty-two robberies. ECF 22. Defendant is serving an 185-month sentence for conspiracy to commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951 (Count One), and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Four). Notably, Count Four charged Hobbs Act Robbery (Count Two) as a predicate crime of violence. That robbery took place on June 11, 2012, at a Wendy's restaurant in Baltimore, and involved two customers. *See* Indictment, Count Two.

---

[1] I incorporate by reference the factual background in my Memorandum Opinion (ECF 261) of October 22, 2020, denying defendant's post-conviction petition.

On February 25, 2013, Bias pled guilty (ECF 63), pursuant to a Plea Agreement. ECF 67; *see also* ECF 146 (Guilty Plea Transcript). Under the Plea Agreement, the government agreed to recommend a sentence within the advisory range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

The Plea Agreement included a lengthy Statement of Facts. ECF 67 at 10-20; ECF 146 at 35-39. It outlined the twenty-two armed robberies committed by Bias and his codefendants during the period from January 2012 to June 2012. Further, it reflected that a firearm was brandished by Bias's codefendant, Hatratico Smith, during the robberies. ECF 67 at 20. In addition, during the robbery of a Royal Farms Store on February 21, 2012, Smith shot a customer in the abdomen. *Id.* at 10, 13-14. And, Smith discharged the weapon during a robbery of another Royal Farms Store on March 6, 2012. *Id.* at 14-15. Bias generally drove the getaway car. *Id.* at 14. But, defendant admitted that he aided and abetted in the robberies, including the brandishing of the firearm. *Id.* at 20.

The Amended Presentence Report ("PSR," ECF 109) took into account all twenty-two robberies in calculating the Guidelines. *See id.* ¶ 42; U.S.S.G. § 1B1.2(c). The parties agreed that, after deductions for acceptance of responsibility, Bias had a final offense level of 31 and a Criminal History Category of III. ECF 147 (Tr.) at 9; *see also* ECF 109, ¶¶ 207; 219.

Under the Guidelines, Count One called for a sentence ranging between 135 and 168 months of imprisonment. And, Count Four required a sentence of 84 months, consecutive. *Id.* ¶¶ 230, 234; *see also* ECF 107 (Statement of Reasons). Therefore, the Guidelines called for a combined, total sentence of imprisonment for Counts One and Four ranging between 219 and 252 months. ECF 109, ¶ 230.

At sentencing on November 26, 2013 (ECF 105), defense counsel made clear that it was Mr. Smith who "always had the firearm…" ECF 147 (Sentencing Transcript) at 11. Defense counsel also said, *id.* at 12: "Mr. Bias did not have–not that it matters legally, but just so the Court understands—he did not even approach anyone with a firearm."

The defendant addressed the Court. *Id.* at 18-21. He expressed remorse, apologized to the victim who was shot and attended the sentencing, and described his efforts at rehabilitation. *Id.*[2]

The Court expressly noted that Mr. Bias's role was not as significant as that of Mr. Smith. *Id.* at 22. But, it also pointed out that the defendant "played an essential part" in the very serious offenses. *Id.*

The Court imposed a term of 101 months' incarceration for Count One and the congressionally mandated minimum sentence of 84 months, consecutive, for Count Four. Thus, Bias received a total sentence of 185 months' incarceration. ECF 106 (Judgment).[3] This sentence was well below the bottom of the Guidelines range. *See* ECF 107 (Statement of Reasons).

Bias, who is now 42 years of age, is serving his sentence at Greenville FCI. Inmate Locator, https://www.bop.gov/inmateloc/index.jsp. He has served about 98 months, or roughly 53% of his sentence. Bias has a projected release date of August 26, 2025.

Bias submitted a request for compassionate release to the Warden on July 3, 2020. ECF 260-1. His request was denied. *Id.*

Additional facts are included, *infra*.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

---

[2] The victim also spoke. ECF 147 at 13-15.

[3] In contrast, Smith received a total sentence of 300 months' incarceration. ECF 119.

3

18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of

4

the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing

Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,

>that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus,

7

it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, __F.3d__, 2021 WL 1216543, at *3 (4th Cir. Apr. 1, 2021) (noting that court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the

extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[4]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[5] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of April 5, 2021, COVID-19 has infected more than 30.8 million Americans and caused over 555,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 5, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer;

10

chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

Unfortunately, there is currently no cure for the virus, although medical treatments have improved. To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").

Prisoner usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

13

On a positive note, the country has recently seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). The vaccines were initially made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons 16 years of age and older. However, challenges remain in securing a vaccination.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 5, 2021, the BOP had 126,111 federal inmates and 36,000 staff. And, by that date, the BOP had administered 122,935 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 5, 2021).

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[6] As of April 4, 2021, BOP reported that 376 inmates out of a total of 126,196 inmates, and 1,270 BOP

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000

14

staff out of some 36,000 staff members, currently test positive for COVID-19; 46,881 inmates and 5,485 staff have recovered from the virus; and 228 inmates and four staff members have died from the virus. Moreover, the BOP has completed 108,438 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 4, 2021). *See COVID-19*, Fed. Bureau of Prisons, https://bit.ly/2XeiYH1.

With respect to Greenville FCI, where the defendant is now a prisoner, the BOP reported as of April 16, 2021, that zero inmates and 14 staff member tested positive for COVID-19, and 707 inmates and 64 staff have recovered at the facility. In addition, 149 staff members and 434 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 16, 2021).

## IV. Discussion

Bias seeks compassionate release, claiming that his asthma renders him particularly vulnerable to COVID-19. ECF 257 at 3. However, Bias has not submitted medical records that establish the severity of his condition or how, if at all, his asthma has any impact on his daily life.

The CDC classifies asthma as a condition that "might" increase the risk of complications due to COVID-19. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR

---

people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 10, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.*

DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY. However, absent evidence as to the degree of the defendant's illness or other underlying conditions that make Bias particularly vulnerable to COVID-19, the evidence before me does not establish an extraordinary and compelling reason for release under § 3582(c)(1)(A).

Because Bias has failed to provide an extraordinary and compelling reason for compassionate release, I need not address the relevant sentencing factors under 18 U.S.C. § 3553(a) and § 3142(g). Nevertheless, I am satisfied that a reduction of Bias's sentence would be inconsistent with those factors.

Bias has only served about 53% of his sentence. And, that sentence was significantly below the bottom of the Guidelines range. As noted, Bias participated in a staggering twenty-two robberies; his codefendant wielded a gun during all twenty-two robberies. A customer was shot and seriously wounded during one of the robberies. The serious nature of the underlying offenses, coupled with defendant's criminal history, do not weigh in favor of reducing his sentence. *See United States v. Kibble*, __ F.3d__, 2021 WL 1216543, at *4 (4th Cir. Apr. 1, 2021) (finding district court was entitled to consider amount of time defendant served and the nature of the offense as factors in the §3553(a) analysis).

Moreover, it does not appear that Bias has fully accepted responsibility. In analyzing a motion for compassionate release, courts are to consider a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [a defendant's] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)) (considering the "extensive evidence of" defendant's rehabilitation since his initial sentencing under § 3553(a) analysis); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020); *cf. United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) (noting that on a motion to

reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct).

Soon after sentencing, Bias submitted correspondence suggesting that his guilty plea was invalid because his lawyer was ineffective. ECF 118. He later moved to vacate under 28 U.S.C. § 2255. ECF 130. In his Motion, he disputed his presence at the scene of the robberies, complained that he did not know about a firearm, and maintained generally that his lawyer failed to challenge the government's case. *Id.* at 5-6; *see also* ECF 130-1; ECF 132; ECF 139; ECF 149. I denied that motion in a Memorandum Opinion and Order of July 8, 2015. ECF 151; ECF 152. Bias moved to reconsider (ECF 158), which was denied. He then noted an appeal to the Fourth Circuit (ECF 162), which dismissed the appeal. ECF 170.[7]

In a submission filed April 27, 2020 (ECF 235), Bias certainly acknowledged his role in the Hobbs Act conspiracy. *Id.* at 1. However, he insisted that he is not responsible for the gun that was brandished during the robberies. *Id.* at 2-3. He reiterated that claim in a submission filed on June 10, 2020. ECF 250.

Yet, in defendant's Plea Agreement (ECF 67), made under oath, he admitted to aiding and abetting in the brandishing of the firearm. *Id.* at 20. And, at the Fed. R. Crim. P. 11 proceeding,

---

[7] Bias also moved for a sentence reduction, pursuant to U.S.S.G. Amendment 599. ECF 165. Thereafter, he amended his motion on September 23, 2016. ECF 193. His motion was denied by Memorandum and Order of April 25, 2018. ECF 210; ECF 211.

The Fourth Circuit also authorized a successive § 2255 motion. ECF 185. Through appointed counsel, a second motion to vacate was filed, concerning whether the conviction under 18 U.S.C. § 924(c) was based on a proper predicate, *i.e.*, a crime of violence. ECF 186. The Federal Public Defender subsequently moved to withdraw (ECF 232) and I granted that motion. ECF 233. Bias filed several pro se submissions in support of his motion. ECF 204; ECF 231. To be sure, the motion was not frivolous; it concerned the predicate offense for defendant's § 924(c) conviction. Ultimately, however, I determined it lacked merit. *See* ECF 261; ECF 262. The ruling is on appeal. ECF 264.

the Court advised Bias that he was charged with aiding and abetting the crimes, and he indicated that he understood. ECF 146 at 11.[8]

In a submission filed September 29, 2020 (ECF 259), Bias again complained about his conviction for Count Four, *i.e.*, the § 924(c) gun offense. He maintained that the government had agreed to dismiss Count Two, which was the predicate crime of violence for Count Four. Therefore, he asserted that he did not get "the benefit of the bargain" and the government violated the Plea Agreement. *Id.* at 2. But, Count Four expressly references Count Two. And, in the Plea Agreement, the elements of Count Four state clearly that defendant committed a crime of violence, "as charged in Count Two of the Indictment…." *See* ECF 67, ¶ 2. Moreover, in reviewing the elements with the defendant at his guilty plea, the Court expressly told defendant, as to Count Four, that in order to convict him the government would have to prove that he committed a crime of violence, *i.e.*, the robbery charged in Count Two. ECF 146 at 11. The defendant indicated that he understood. *Id.*

Therefore, defendant's continued insistence that he was wrongfully convicted of the gun offense rings hollow.

## V. Conclusion

Given defendant's failure to provide support for an extraordinary and compelling reason for release, coupled with the facts of the offenses, and the abbreviated time defendant has served to date, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time. Therefore, I shall deny the Motion (ECF 257), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

---

[8] Again, the Court recognized that Bias was not the one who carried the weapon. As noted, Smith, who carried the weapon, received a total sentence of 300 months. ECF 119. For several reasons, defendant received a sentence of 185 months of imprisonment.

Date: April 20, 2021 /s/
Ellen Lipton Hollander
United States District Judge